Filed 6/18/15

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D065056 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS264145) |
| TAHEEDAH FORREST, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Ana L. Espana, Judge. Affirmed as modified and remanded with directions.

Avatar Legal and Cynthia M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rule 8.110, this opinion is certified for publication with the exception of parts I, II, III and V of the Discussion.

This case arose in the courthouse in Chula Vista when defendant Taheedah Forrest physically attacked and threatened her sister-in-law, Patria Smith, who was testifying as a prosecution witness against Forrest's brother (Smith's husband) during his robbery trial. In the present case, a jury convicted Forrest of (1) dissuading a witness (Smith) from testifying (count 1:  Pen. Code, § 136, subd. (a)(1); all further undesignated statutory references will be to the Penal Code unless otherwise specified), and (2) making a criminal threat (count 2:  § 422).  As to count 1 the jury found to be true an allegation that Forrest committed and attempted to commit that offense through the use of force and an express and implied threat of force (§ 136, subd. (c)(1)).  The court sentenced Forrest to three years' formal probation, conditioned on her serving 365 days in jail with credit for time already served.

On appeal Forrest challenges her convictions, contending (1) the court prejudicially erred by allowing an investigator to testify for the prosecution that he had conducted a threat assessment for the district attorney's office and had determined that Smith should be placed in a witness protection program, (2) the prosecutor committed misconduct by prejudicially engaging in impermissible vouching in violation of Forrest's federal constitutional right to due process, and (3) the court prejudicially erred by failing to instruct the jury sua sponte on the lesser included offense of attempting to make a criminal threat.

Forrest also contends that three conditions of her probation (conditions 6.d., 12.f., and 12.g.) are unconstitutionally vague and/or overbroad and must be either stricken or modified.

2

Last, Forrest contends that both the October 28, 2013[1] minute order and the October 28 probation order must be corrected to reflect the court's oral pronouncement of sentence that she serve 365 days (not 372 days) in local custody as a condition of her probation. The Attorney General acknowledges the minute order and probation order should be corrected to conform to the oral pronouncement of judgment.

For reasons we shall explain, we modify condition 12.g. of Forrest's probation in order to avoid unconstitutional overbreadth, and we affirm the judgment as so modified. However, we remand the matter to the superior court with directions to correct the October 28 minute order and the October 28 probation order to reflect the court's oral pronouncement of sentence that she serve 365 days in local custody as a condition of her probation.

## FACTUAL BACKGROUND

On April 12 the victim in this case, Smith, testified as a prosecution witness at the San Diego County Superior Court's courthouse in Chula Vista in a criminal case in which Smith's husband, Lukmond Muhammad, and Anthony Bolden were on trial for committing a robbery. Smith was also charged in connection with the robbery because she had participated as the getaway driver. After she pleaded guilty to being an accessory after the fact, she entered into an agreement with the district attorney's office under which she would testify truthfully against her husband and Bolden, and in exchange she would be sentenced to custody for the length of time she had already served.

---

1      All further dates are to calendar year 2013.

3

Forrest is Smith's sister-in-law because Smith is married to her brother. Forrest and her sister, Fatima Muhammad,[2] were in the courtroom on April 12, the day Smith testified against Lukmond.

In the present case, Smith testified for the prosecution that while she was testifying at Lukmond's trial, Forrest made noises, whispered, and twice stood up and left the courtroom in "a loud, rude[] manner." Later, after the court announced a recess during Smith's testimony, Smith and her godmother, Veronica Hall, stepped out of the courtroom and took the elevator to the second floor to use the restroom. When they found the women's restroom was closed, they headed for the escalator. Before they reached the escalator, Forrest and her sister, Fatima, approached Smith.

Smith also testified that Forrest was angry when she approached Smith, and Forrest "got in [her] face" while "talking a lot of verbal abuse." Smith further testified that Forrest spoke to her in a "mean manner" and angrily kept yelling, "You're going to get it. You're going to get it. Do you think you are going to live? You are going to get it after court." Smith testified that Fatima was "holding [Forrest] back" while Forrest was yelling at Smith.

In similar testimony, Hall stated that Forrest "called [Smith] some names" and said to Smith, "You think you will live through this? We will get you. We will get you when you get out of here. Wait until we get out of here outside." Hall also testified that Forrest told Smith she did not understand why Smith was testifying against Forrest's brother.

---

[2]     As Fatima Muhammad and Lukmond Muhammad share the same last name, we shall refer to them by their first names.

Smith testified that she "asked [Forrest] what was the problem," and then Hall pulled Smith away and they (Smith and Hall) "just walked away" toward the escalators while Forrest continued to angrily yell across the room. Before Smith and Hall reached the escalators, Forrest approached Smith and hit her in the face. Smith described the blow as "a hard impact" and testified she believed Forrest had been holding an object in the hand she had used in hitting her. Smith's injuries included a swollen lip and scratches on her cheek near her nose. The force of the impact broke Smith's glasses and caused them to fall to the floor in pieces.

Hall yelled for help and a sheriff's deputy responded. Smith recounted the incident to the deputy district attorney and eventually she was taken to a jury room.

Julio Barrios, a supervising investigator for the district attorney's office, testified that when he arrived at the courthouse and met with Smith in the jury room after the incident, she appeared "shaken up" and "upset," and she had "tears on her face." Barrios also testified that Smith told him she did not want to testify.

Smith testified that, as a result of Forrest's actions outside the courtroom, she did not want to continue testifying at Lukmond's trial because she "felt as if [her] life was in danger, and [she] was scared of . . . [the] possibility of what could happen afterwards." Smith was not able to finish testifying that day.

Smith also testified she met with an investigator for the district attorney's office (Barrios) after the April 12 incident for the purpose of assessing whether she would need to relocate, and she did have to relocate.

5

Deputy Cesar Castillo of the San Diego County Sheriff's Department testified that on April 12 he interviewed Fatima and Forrest at the courthouse regarding the incident. He testified that Fatima told him that Forrest had argued with Smith over Smith's testifying at trial. He also testified that Fatima did not indicate Forrest had been attacked or spat upon.

Sheriff's deputies later arrested Forrest based on an outstanding felony warrant. A courthouse surveillance video recording of the April 12 incident showing Forrest hitting Smith was played for the jury and admitted into evidence.

Forrest testified in her own defense. She testified that she had learned from Smith that Smith was going to testify at her (Forrest's) brother's trial. Defense counsel asked Forrest whether, when she came to court on April 12 to attend Lukmond's trial, "it bother[ed] [her] at all [that Smith] was testifying in [her] brother's case." Forrest replied, "No."

Forrest admitted on cross-examination that she angrily slapped Smith in the face and left a scratch because "[her] nails [were] long." She testified that she slapped Smith because Smith had "talk[ed] S-H-I-T to [her]" and spat in her face.

DISCUSSION

I. *ADMISSION OF BARRIOS'S TESTIMONY*

Forrest first contends her convictions should be reversed because the court prejudicially erred by allowing Barrios, an investigator for the district attorney's office, to testify for the prosecution that he had conducted a "threat assessment" for the district attorney's office and had determined that Smith should be placed in a witness protection

6

program as a result of the April 12 courthouse incident in which Forrest attacked Smith. Specifically, Forrest contends (1) the court "abused its discretion in allowing Barrios's irrelevant and unduly prejudicial testimony about why the [prosecution] believed it was justified in placing Smith in the witness protection program," and (2) the court also "abused its discretion in refusing to grant a mistrial after this evidence was admitted." Forrest's contentions are unavailing.

A. *Background*

1. *Barrios's testimony about the threat assessment and Forrest's mistrial motion*

During his cross-examination of Smith in this case, defense counsel asked her whether it was true that she had received money from the prosecution. Specifically, Forrest's attorney asked Smith: "[A]fter you completed your testimony in [Lukmond's] case, you were given some money from the district attorney so that you could move to another location; isn't that true? [¶] Isn't that true, ma'am, you were given some money and relocated to another location from the district attorney?"

Shortly thereafter, on redirect examination, the prosecutor introduced the phrase "threat assessment" to the jury by asking Smith, "After meeting with [the] D.A. investigator, after this incident that happened [on April 12] here on the second floor, did he do what is called a threat assessment?" The court sustained a defense objection and Smith did not answer the question. The following exchange then took place between the prosecutor and Smith:

> "[The prosecutor]: Did you and the D.A. investigator talk about the options of moving outside the county?

7

"[Smith]: Yes.

"[The prosecutor]: And was that because of this incident that happened on April 12th, 2013?

"[Smith]: Yes.

"[The prosecutor]: Okay. Prior to April 12th, 2013, had you received any money from the D.A.'s office—

"[Smith]: No.

"[The prosecutor]: —to testify in that robbery case?

"[Smith]: No."

The prosecutor then asked Smith: "Any money that you received after April 12th was a result of the need to relocate you; is that right?" After the court sustained an objection by defense counsel, the prosecutor rephrased his question and the following exchange occurred about why Smith was receiving money from the district attorney's office:

"[The prosecutor]: [A]s far as you knew, why did you receive money from the D.A.'s office?

"[Smith]: To relocate.

"[The prosecutor]: Right. Was that to pay for some of your moving expenses ?

"[Smith]: Yes. [¶] . . .

"[The prosecutor]: Was some of the money given to you . . . so you could get out of town?

"[Smith]: Yes."

8

The prosecution later called Barrios to testify about his April 12 interview of Smith immediately after Forrest attacked her at the courthouse. Barrios testified about Smith's condition and about her statement to him that she did not want to testify. Shortly thereafter Barrios stated, "[W]e realized we had a witness protection issue now, and so I took a statement from her and got the information to do a threat assessment." At the prosecutor's request, Barrios explained that "[a] threat assessment is . . . basically an assessment involving the safety and security of a witness for potential or actual threats or attacks against a witness."

Defense counsel objected and asked for a mistrial, stating that Barrios's testimony was "incredibly irrelevant and incredibly prejudicial." Overruling the objection, the court told defense counsel he could make "further arguments outside the presence of the jury when we recess later on in a few minutes."

Barrios then testified that "the decision was made to do a preliminary or what we call an emergency relocation." The prosecutor asked Barrios to explain, and he responded that, "with the consent of the individual—once we complete the initial threat assessment, then we move them from their residence to a temporary, undisclosed location." Barrios explained that the district attorney's office pays for the cost, but it "get[s] reimbursement from the State of California through a witness protection program." Barrios also explained that Smith was moved that night (April 12) to a temporary location and ultimately her relocation "went from a temporary to a more permanent relocation."

The prosecutor asked Barrios about "the purpose of moving [Smith] to another location permanently." Barrios replied, "To keep her safe, to make her safe."

Agreeing that Smith's relocation was a "result of what happened on April 12th," Barrios testified that the monthly amount she would receive to cover rent and other living expenses "once the permanent relocation was established" was calculated to be $1,735 a month and the payments would end 180 days "after the case is over."

Following an unreported sidebar conference, defense counsel argued in chambers that Barrios's testimony about a "threat assessment and everything else" was "totally irrelevant to the charges before [the] jury," it "ha[d] nothing to do with whether or not these crimes were committed," and "[i]t solely goes to try and prejudice my client."

Observing that there had been "a discussion about money" and defense counsel had "brought that out," the court stated that it "seem[ed] . . . reasonable for the People . . . to follow-up and just explain how that . . . came about."

Responding that "the jury certainly has the right to hear whether or not the district attorney has been providing any funding to [Smith]," defense counsel stated, "I don't think the jury has the right to know . . . that the district attorney's office did this investigation and . . . reached this threat assessment thing," or that, "based on this threat assessment thing, that's why they decided to send her to . . . wherever they sent her and pay her transportation and pay her money." Defense counsel continued:

> "That's another way of . . . saying to the jury, [']Ladies and gentlemen, we thought this witness was so terrified, that she was so at-risk of being injured, that she was so subject to potential threats, that we decided we better get her out of the state. [¶] It has no

10

relevance to whether these charges are true or not. It's not of any evidentiary value. It's only prejudicial."

Defense counsel asked the court to strike Barrios's testimony about the threat assessment, and also renewed his request for a mistrial.

In response the prosecutor pointed out that Forrest's attorney had asked Smith whether she was "receiving money from the D.A.'s office." The prosecutor argued that the People had a right to explain to the jury why Smith was receiving money from the district attorney's office:

> "The way [defense] counsel . . . would like to leave it is that [Smith] is getting $825 a month . . . and it looks like she is being a witness that has been paid off. [¶] And I have every right to explain why [Smith] [is] getting paid, and [defense] counsel is the one who opened the door to that. Mr. Barrios wouldn't have had [to] testify if [defense counsel] hadn't opened that door with [Smith] so I have every right to try to explain that."

Responding to defense counsel's objections, the court stated:

> "[T]here has been a lot of discussion about money being paid to [Smith] from the district attorney's office and her having to relocate, and that she did relocate. And we know now that she is still relocated and not in San Diego. So all of that has come in as part of [Smith]'s testimony, and it seems that both counsel wanted that information to come out. And certainly you crossed[-examined] on that, and there was a lot you had in terms of cross-examination on those issues.
>
> "So this didn't surprise me so much as it was really a follow-up to that. And it seemed reasonable to at least have [the] People explain why that came about so that it makes sense. It sort of connects the dots."

The court ultimately denied defense counsel's request for a mistrial, stating:

> "I feel that the testimony was appropriate given—particularly the cross-examination that was done in this case. It helps further explain

11

to the jury why things were done.  [¶] . . . All the things that you talked about, the money, the move out is all relevant, and this is just the witness explaining that process and how it went about."

2. *The court's limiting instruction*

The following day, before Barrios resumed testifying, the court provided the following instructions to the jury:

"You heard testimony yesterday from [Barrios] that he interviewed [Smith] after the alleged incident . . . which is alleged to have occurred on April 12th.  You heard testimony from [Barrios] yesterday that he conducted what he described . . . as a threat assessment.  I am going to redact the word 'threat' and order that you not consider that for any purpose, the word [']threat[,'] as part of an assessment.  And that the jury is to disregard the use of that term or the word [']threat.[']

"You also heard evidence that it was after this . . . completed assessment that the decision was made to relocate [Smith].

"Now, let me emphasize this to you.  This testimony that you heard yesterday is not to be used by you in determining whether or not the defendant, [Forrest], is guilty of the charges against her.  Again, let me reiterate it to you.  The testimony that you heard yesterday is not to be used by you in determining whether or not [Forrest] is guilty of the charges against her.  That testimony yesterday by [Barrios] was admitted for a limited purpose only, and that is to explain the subsequent living arrangements of . . . [Smith]'s housing, move out of the state, the money that she received from the district attorney's office—that kind of evidence which you've already heard—ample evidence of.  And that's what the purpose of that testimony was yesterday, and you are to consider it only for that purpose to explain, again, her housing situation, her move out of state, and the money she receives from the district attorney's office.

"Again, I'll remind you, you are the judges of the facts.  Your job is to determine whether or not a crime occurred in this case and whether or not the People have proved every element of each charge beyond a reasonable doubt.  Again, that's your job."

12

Later in the trial Forrest's attorney introduced impeachment evidence suggesting Smith had fabricated her testimony out of a desire to relocate at the district attorney's expense. Fatima testified on behalf of the defense that she heard Smith more than once express a desire to get out of San Diego. She also testified that Smith told her that she was thinking of moving to the East Coast to be with her grandmother.

During his closing argument, the prosecutor addressed Barrios's testimony:

> "Investigator Barrios . . . took the stand. [¶] [During the robbery trial on April 12], [Smith] identified her husband as one of the suspects, explained the reason for the relocation. Look[,] we had a witness that had been threatened, had been slapped in court. Her testimony wasn't done. We needed to move her. That explains the money paid to [Smith]. [She] isn't a witness who is receiving cash payments so that [she] can testify a certain way. She didn't receive a cent before April 12th, 2013. So any indication that she is somehow a bought-off witness is completely false. The only reason she had anything paid to her or for her was because of the need to relocate her, because of what happened on April 12th. That's what investigator Barrios explained to us."

As pertinent here, the court instructed the jury under CALCRIM No. 303 that "[d]uring the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other."

B. *Applicable Legal Principles*

1. *Mistrial motions*

Generally, "[w]e review the denial of a motion for mistrial under the deferential abuse of discretion standard." (*People v. Cox* (2003) 30 Cal.4th 916, 953, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) The *Cox* court explained that "'"[a] mistrial should be granted if the court is apprised of prejudice that it

13

judges incurable by admonition or instruction. [Citation.] [T]he trial court is vested with considerable discretion in ruling on mistrial motions."'" (*Cox*, at p. 953.).)

2. *Evidentiary rulings*

a. *Evidence Code sections 350 and 210*

Evidence Code section 350 provides that only relevant evidence is admissible. Evidence Code section 210 defines relevant evidence as "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."

b. *Evidence Code section 352*

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"When an objection to evidence is raised under Evidence Code section 352, the trial court is required to weigh the evidence's probative value against the dangers of prejudice, confusion, and undue time consumption. Unless these dangers 'substantially outweigh' probative value, the objection must be overruled." (*People v. Cudjo* (1993) 6 Cal.4th 585, 609.) Thus, evidence is properly excluded under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will . . . necessitate undue consumption of time or . . . create a substantial danger of

14

undue prejudice, of confusing the issues, or of misleading the jury."  (§ 352; *Cudjo*, at p. 609.)

The California Supreme Court has explained that "[t]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.  '[All] evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial."  The "prejudice" referred to in Evidence Code section 352 applies to evidence which *uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues*. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging."'"  (*People v. Karis* (1988) 46 Cal.3d 612, 638, italics added.)

3. *Standards of review*

"[A] trial court has broad discretion in determining the relevance of evidence" (*People v. Carter* (2005) 36 Cal.4th 1114, 1166-1167), and we will not reverse the court's ruling unless there is a clear abuse of discretion (*People v. Waidla* (2000) 22 Cal.4th 690, 717-718).  We also review the trial court's rulings under Evidence Code section 352 for an abuse of discretion.  (*People v. Lewis* (2001) 25 Cal.4th 610, 637.)

Under the abuse of discretion standard of review, a trial court's exercise of discretion in admitting or excluding evidence will not be disturbed, and reversal of the judgment is not required, "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

15

"The 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.'" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1010.) A trial court's error under state law in the admission or exclusion of evidence following an exercise of discretion is properly reviewed for prejudice under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203.) Under the *Watson* harmless error test, the trial court's judgment may be overturned only if "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*Watson,* at p. 836.)

C. *Analysis*

We first reject Forrest's contention that the court "abused its discretion in allowing Barrios's *irrelevant* and *unduly prejudicial* testimony about why the [prosecution] believed it was justified in placing Smith in the witness protection program." (Italics added.) As discussed more fully in the foregoing background, defense counsel attacked Smith's credibility as the People's principal witness by (1) eliciting her testimony on cross-examination that she was receiving regular monthly payments from the district attorney's office in the amount of $825 so that she could move from San Diego; and by (2) eliciting testimony from Forrest's sister, Fatima, that she had heard Smith express a desire to get out of San Diego and that Smith had told her she was thinking of moving to the East Coast to be with her grandmother. The defense presented this testimony to support an inference that Smith's testimony about the April video-recorded incident that is the subject of this prosecution was not credible because she had a financial motive to provide testimony that supported the People's case. Indeed, defense counsel told the jury

16

during his closing argument that "they are paying her, and they are still paying her. She has been relocated to someplace. And . . . my recollection of Mr. Barrios' testimony is that they are paying her $1,735 a month. [¶] . . . [¶] So I think *there [are] lots of reasons why you have to be skeptical of her testimony*." (Italics added.)

We conclude the court did not abuse its broad discretion in admitting Barrios's challenged testimony about the threat assessment he conducted and his determination that Smith should be placed in a witness protection program as a result of the April 12 incident. His testimony was relevant to the issue of Smith's credibility, which the defense vigorously attacked, because it was an explanation of how and why the district attorney's office was financially assisting her, and thus it had some "tendency in reason" (Evid. Code, § 210) to disprove the inference the defense plainly intended the jury to draw that Smith had a financial motivate to lie. The defense opened the door by presenting evidence that Smith was receiving payments from the district attorney's office and the court did not abuse its discretion by allowing the prosecution to present Barrios's relevant testimony explaining how and why the district attorney's office was financially assisting her.

Also, Forrest has failed to meet her burden of showing the probative value of Barrios's testimony was "substantially outweighed by the probability that its admission [would] create substantial danger of undue prejudice" within the meaning of Evidence Code section 352. As noted, the defense very effectively attacked Smith's credibility by presenting evidence she was receiving substantial sums of money from the District attorney's office. By failing to present evidence explaining why she was receiving that

17

money, the defense obviously intended that the jury draw an inference that Smith's crucial testimony in support of the People's case was in exchange for the payments she was receiving. In the exercise of its broad discretion, the court properly allowed the prosecution to present Barrios's testimony explaining why Smith was receiving those payments so that the jury could make an informed and just finding regarding Smith's credibility. The court also acted properly to avoid undue prejudice by instructing the jury to "not consider . . . for any purpose" the word "threat" used by Barrios in the phrase "threat assessment." Barrios's testimony that Smith was placed in the witness protection program as a result of the April 12 courthouse incident was not unduly prejudicial. The jury already had heard Smith's and Hall's detailed testimony about Forrest's video-recorded physical attack on Smith and the testimony showing Smith did not want to continue testifying in Lukmond's trial after Forrest attacked and threatened her. The jurors had also seen a photograph of the injuries Smith suffered when Forrest hit her.

As already discussed, all evidence that tends to prove guilt is prejudicial or damaging to the defendant's case, and the stronger the evidence, the more it is "prejudicial." (*People v. Karis*, *supra*, 46 Cal.3d at p. 638.) However, for purposes of applying Evidence Code section 352, "prejudicial" is not synonymous with "damaging." (*Karis*, at p. 638.) Here, we conclude that while Barrios's challenged testimony was undoubtedly damaging to the defense, it was not unduly prejudicial for purposes of Evidence Code section 352. In light of our conclusions, we need not address Forrest's contention that the admission of the challenged portions of Barrios's testimony was not harmless under the *Watson* harmless error test.

18

We also reject Forrest's contention that the court "abused its discretion in refusing to grant a mistrial after this evidence was admitted." As discussed, *ante*, a trial court is vested with considerable discretion in ruling on a mistrial motion. (*People v. Cox*, *supra*, 30 Cal.4th at p. 953.) As noted, the court gave the jury curative instructions. In light of those instructions and the overwhelming evidence of Forrest's guilt, we conclude the court did not abuse its discretion in denying her motion for a mistrial.

## II. *CLAIM OF IMPERMISSIBLE VOUCHING BY THE PROSECUTOR*

Forrest also contends her convictions should be reversed because the prosecutor committed misconduct by prejudicially engaging in impermissible vouching in violation of Forrest's federal constitutional right to due process. This contention is unavailing.

### A. *Applicable Legal Principles*

A prosecutor in a criminal case can commit misconduct under either federal or state law. "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

A prosecutor commits misconduct by improperly vouching for the credibility of a witness. The California Supreme Court has explained that "[a] prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record. [Citations.] Nor is a prosecutor

19

permitted to place the prestige of her office behind a witness by offering the impression that she has taken steps to assure a witness's truthfulness at trial." (*People v. Frye* (1998) 18 Cal.4th 894, 971, overruled on other grounds in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22.) A prosecutor also may not "express a personal opinion or belief in a defendant's guilt, where there is substantial danger that jurors will interpret this as being based on information at the prosecutor's command, other than evidence adduced at trial." (*People v. Bain* (1971) 5 Cal.3d 839, 848.)

However, as the California Supreme Court repeatedly has held, to preserve a claim of prosecutorial misconduct for appeal a defendant must (1) object in a timely fashion on that ground, *and* (2) request a curative jury admonition unless an admonition would not have cured the harm caused by the misconduct. (*People v. Stanley* (2006) 39 Cal.4th 913, 952 (*Stanley*); *People v. Hinton* (2006) 37 Cal.4th 839, 863 (*Hinton*); *People v. Crew* (2003) 31 Cal.4th 822, 839 (*Crew*).)

B. *Analysis*

In support of her claim of prosecutorial misconduct, Forrest asserts the prosecutor "improperly vouched for Smith's credibility" by presenting Barrios's testimony "about the witness relocation program" and by relying on that testimony during his closing argument because "[t]he testimony and argument had the effect of telling the jury that the People had conducted an assessment prior to trial and that based on the assessment, [the People] had concluded that Smith had been threatened and that her safety was at risk." Forrest also complains that the prosecutor engaged in "impermissible vouching based on facts outside the record" by stating during his closing argument that he brought this case

20

against Forrest because a crime had been committed and he believed he could prove it beyond a reasonable doubt based on evidence that a crime occurred.

In response the Attorney General argues that Forrest "forfeited her right to argue for the first time on appeal" that the prosecutor committed prejudicial misconduct by engaging in improper vouching because Forrest "did not object . . . on the grounds of vouching." We agree. To preserve for appeal her claim that the prosecutor committed prosecutorial misconduct by engaging in impermissible vouching, she was required to both (1) object in a timely fashion *on that ground,* and (2) request a curative jury admonition unless an admonition would not have cured the harm caused by the misconduct. (*Stanley*, *supra*, 39 Cal.4th at p. 952; *Hinton*, *supra*, 37 Cal.4th at p. 863; *Crew*, *supra*, 31 Cal.4th at p. 839.) A review of the record discloses that the defense never raised in the trial court an objection that the prosecutor committed misconduct by engaging in improper vouching, the defense did not raise any objection that was tantamount to such an objection, nor did the defense ever request a curative jury admonition. Accordingly, we conclude Forrest forfeited her prosecutorial misconduct claims.

### III.  *INSTRUCTIONAL ERROR CLAIM*

Forrest further contends her convictions should be reversed because the court prejudicially erred by failing to instruct the jury sua sponte on the lesser included offense of attempting to make a criminal threat. We reject this contention.

A.  *Applicable Legal Principles*

1.  *Criminal threat and attempted criminal threat*

"[T]he crime of criminal threat is set forth in section 422."  (*People v. Toledo* (2001) 26 Cal.4th 221, 227 (*Toledo*).)  "In order to prove a violation of section 422, the prosecution must establish all of the following:  (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in *sustained fear for his or her own safety* or for his or her immediate family's safety,' and (5) that the threatened person's fear was '*reasonabl*[*e*]' *under the circumstances*."  (*Toledo*, at pp. 227-228, italics added.)

Although section 422 (as pertinent here) requires the threatened person "reasonably to be in *sustained fear* for his or her own safety" (§ 422, subd. (a), italics added), that statute does not define the term "sustained fear."  (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1150 (*Allen*); see § 422.)  However, the courts have held that a threatened person's fear, to be "sustained" within the meaning of section 422, need only

22

be for a "'period of time that extends beyond what is momentary, fleeting, or transitory.'" (*People v. Fierro* (2010) 180 Cal.App.4th 1342, 1349 (*Fierro*), quoting *Allen*, at p. 1156.)

"[U]nder California law, there is a crime of *attempted* criminal threat." (*Toledo*, *supra*, 26 Cal.4th at p. 224.) "A variety of potential circumstances fall within the reach of the offense of attempted criminal threat." (*Id*. at p. 231.) For example, "if a defendant, . . . acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat." (*Ibid*.)

2. *Principles governing a trial court's duty to instruct on a lesser included offense*

"The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request." (*People v. Blair* (2005) 36 Cal.4th 686, 744.) "That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser." (*Id*. at p. 745.)

Thus, "[a] trial court has a sua sponte duty to 'instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser.'" (*People v. Shockley* (2013) 58 Cal.4th 400, 403.) "Substantial evidence in this context is evidence from which a reasonable jury could

23

conclude that the defendant committed the lesser, but not the greater, offense." (*Ibid.*)

The trial court "need instruct the jury on a lesser included offense only '[w]hen there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of' the lesser offense." (*Id.* at p. 404.)

a. *Watson harmless error standard*

"[I]n a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under *Watson.* A conviction of the charged offense may be reversed in consequence of this form of error only if, 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred." (*People v. Breverman* (1998) 19 Cal.4th 142, 178, citing *Watson*, *supra*, 46 Cal.2d at p. 836, fn. omitted.)

b. *Standard of review*

"An appellate court applies the independent or de novo standard of review to the failure by a trial court to instruct on an uncharged offense that was assertedly lesser than, and included, in a charged offense." (*People v. Waidla*, *supra*, 22 Cal.4th at p. 733.)

B. *Analysis*

In support of her contention that the court prejudicially erred by failing sua sponte to instruct the jury on attempted criminal threat as a lesser included offense of the crime of making a criminal threat (§ 422) charged in count 2, Forrest asserts "there was

24

evidence from which the jury could conclude that [she] intended to threaten Smith," but that Smith was not "actually placed in *sustained fear*." (Italics added.)

As already discussed, "if a defendant, . . . acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in *sustained fear* for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat." (*Toledo*, *supra*, 26 Cal.4th at p. 231, second italics added.) To be sustained within the meaning of section 422, the threatened person's fear need only be for a "'period of time that extends beyond what is momentary, fleeting, or transitory.'" (*Fierro*, *supra*, 180 Cal.App.4th at p. 1349), quoting *Allen*, *supra*, 33 Cal.App.4th at p. 1156.)

We conclude the court did not err in failing to instruct the jury sua sponte on the lesser included offense of attempting to make a criminal threat because (1) there is no substantial evidence from which a reasonable jury could find that Smith did *not* suffer sustained fear—that is, that she suffered only momentary, fleeting, or transitory fear—following Forrest's video-recorded attack and her threatening statements; and, thus, (2) there is no substantial evidence from which a reasonable jury could find that Forrest was guilty of the lesser offense of attempting to make a criminal threat but not guilty of the charged offense of making a criminal threat. Smith testified that before Forrest hit her, Forrest angrily yelled at her, "You're going to get it. You're going to get it. *Do you think you are going to live*? You are going to get it after court." (Italics added.) In

25

similar testimony, Hall stated that Forrest told Smith, "*You think you will live through this*? We will get you. *We will get you when you get out of here*. Wait until we get out of here outside." (Italics added.) At trial Forrest admitted that she angrily hit Smith in the face. According to Smith, the force of the impact broke her glasses and caused them to fall to the floor in pieces. Smith also testified that when she went back upstairs and spoke to the prosecutor, she said she did not want to testify because she felt "scared" and "felt as if [her] life was in danger."

Other witnesses testified that Smith appeared to be frightened after Forrest hit her and threatened her. When asked about Smith's demeanor after the incident, Hall testified that Smith was scared. Barrios testified that when he arrived at the courthouse and met with Smith in the jury room after the incident, she appeared "shaken up" and "upset," and she had "tears on her face." Barrios also testified that Smith told him she did not want to testify. Smith testified that she met with Barrios after the incident for the purpose of assessing whether she would need to relocate, and that she did have to relocate.

In support of her claim of instructional error, Forrest points to her own testimony and Fatima's testimony that before Forrest hit Smith, Smith made taunting remarks as she (Smith) was walking away. Forrest also relies on her trial counsel's statements during his closing argument that the video of the incident showed that when Smith and Forrest "got near each other," Smith did not "flinch" and was "standing her ground." Forrest also relies on the fact that her trial counsel, after referring to Smith's testimony that she walked away from Forrest before Forrest hit her, asked the jury during his closing argument, "Does that sound like somebody who is frightened? Does that sound like

26

somebody who feels that they have been threatened, that their life has been threatened?" Pointing out the obvious, we note that Forrest is relying on evidence and defense counsel's statements to the jury relating to Smith's conduct *before* Forrest physically attacked Smith by hitting her in the face.

We conclude Forrest has failed to show there is substantial evidence from which a reasonable jury could find that Smith did *not* suffer sustained fear—that is, that she suffered only momentary, fleeting, or transitory fear—following Forrest's video-recorded attack and her threatening statements. Thus, we also conclude Forrest has failed to meet her burden of showing there is substantial evidence from which a reasonable jury could find that Forrest was guilty of the lesser offense of attempting to make a criminal threat but not guilty of the charged offense of making a criminal threat. (See *People v. Shockley*, *supra*, 58 Cal.4th at p. 403 ["Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, but not the greater, offense."].)

Even if we were to assume for the purpose of argument that she had met her burden of showing there is such evidence and that the court had committed error by failing to instruct the jury on the lesser offense of attempting to make a criminal threat, we would conclude in light of the strong evidence of her guilt (discussed, *ante*) that she has failed met her burden under *Watson* of showing a reasonable probability that she "would have obtained a more favorable outcome had the error not occurred." (*Breverman*, *supra*, 19 Cal.4th at p. 178, citing *Watson*, *supra*, 46 Cal.2d at p. 836, fn. omitted.)

27

For all of the foregoing reasons, we affirm Forrest's convictions.

## IV.  *PROBATION CONDITIONS*

Forrest next contends that conditions 6.d., 12.f., and 12.g. of her probation are unconstitutionally vague and/or overbroad and must be either stricken or modified.  We uphold conditions 6.d. and 12.f., but we modify condition 12.g. in order to avoid unconstitutional overbreadth.

### A.  *Applicable Legal Principles*

A trial court has broad discretion in selecting the conditions of a defendant's probation.  (*People v. Olguin* (2008) 45 Cal.4th 375, 379 (*Olguin*).)  Generally, a probation condition that regulates noncriminal conduct will be upheld if it is reasonably related to (1) the crime of which the defendant was convicted, or (2) the goal of preventing future criminality.  (*Id.* at pp. 379-380.)

Although challenges to the constitutionality of probation conditions on the grounds of vagueness and overbreadth are frequently made together, the concepts are distinct.  "[T]he underpinning of a vagueness challenge is the due process concept of 'fair warning.'"  (*In re Sheena K.* (2007) 40 Cal.4th 875, 890 (*Sheena K.*); see U.S. Const, Amends. 5, 14; Cal. Const., art. I, § 7.)  A probation condition is unconstitutionally vague if it is not " 'sufficiently precise for the probationer to know what is required of him [or her], and for the court to determine whether the condition has been violated.'"  (*Sheena K.*, at p. 890.)  "A probation condition should be given 'the meaning that would appear to a reasonable, objective reader.'"  (*Olguin*, *supra*, 45 Cal.4th at p. 382.)  Also, the

probation condition should be evaluated in its context, and only reasonable specificity is required. (*People v. Lopez* (1998) 66 Cal.App.4th 615, 630 (*Lopez*).)

In contrast, a probation condition is unconstitutionally overbroad if it imposes limitations on the probationer's constitutional rights and it is not closely or narrowly tailored and reasonably related to the compelling state interest in reformation and rehabilitation. (*Sheena K.*, *supra*, 40 Cal.4th at p. 890; *In re Victor L.* (2010) 182 Cal.App.4th 902, 910.) "The essential question in an overbreadth challenge is the closeness of the fit between the legitimate purpose of the restriction and the burden it imposes on the defendant's constitutional rights—bearing in mind, of course, that perfection in such matters is impossible, and that practical necessity will justify some infringement." (*In re E.O.* (2010) 188 Cal.App.4th 1149, 1153.) In an appropriate case, a probation condition that is not "'sufficiently narrowly drawn'" may be modified and affirmed as modified. (*Lopez, supra,* 66 Cal.App.4th at p. 629; see also *In re E.O.*, *supra*, 188 Cal.App.4th at p. 1158.)

A defendant who did not object to a probation condition at sentencing may do so on appeal if the appellate claim "amount[s] to a 'facial challenge'" that challenges the condition on the ground its "phrasing or language . . . is unconstitutionally vague or overbroad" and the determination whether the condition is constitutionally defective "does not require scrutiny of individual facts and circumstances." (*Sheena K., supra,* 40 Cal.4th at pp. 885-886.)

On appeal we independently review constitutional challenges to a probation condition. (*In re Shaun R.* (2010) 188 Cal.App.4th 1129, 1143.)

29

B. *Analysis*

The three probation conditions that Forrest challenges—conditions 6.d., 12.f., and 12.g.—are set forth in the completed standardized probation order form ("Order Granting Formal Probation," hereafter the probation order) filed in this matter on October 28.

1. *Condition 12.f*: *restriction on possessing weapons*

Condition 12.f. states: "Do not knowingly own, transport, sell, or possess any weapon, firearm, *replica* firearm or weapon, ammunition, or *any instrument used as a weapon*." (Italics added.)

Claiming condition 12.f. is unconstitutionally vague and overbroad and must be stricken or modified, Forrest asserts (1) the word "replica" is vague, (2) the phrase "any instrument used as a weapon" is vague, and (3) the condition is overbroad because it lacks an exception for temporary possession of a weapon in lawful self-defense. We reject her facial challenges to condition 12.f.

a. "*Replica*"

In support of her claim that the word "replica" is unconstitutionally vague, Forrest cites two dictionary definitions, stating that "replica" is defined (1) in the Collins English Dictionary as "'an exact copy or reproduction, especially on a smaller scale,'" and (2) in the Merriam-Webster Online Dictionary as "'an exact or very close copy of something.'" Forrest contends that, based on these definitional differences, the term "replica firearm" in condition 12.f. lacks sufficient precision to place her on notice of what conduct is prohibited.

30

Forrest's claim of constitutional vagueness is unavailing. The fact that one definition requires an exact copy of an item and references smaller scale reproductions, and the other makes no reference to size, does not render the word unconstitutionally vague. Taken in context, the word is reasonably specific. (See *Lopez*, *supra*, 66 Cal.App.4th at pp. 629-630 [a probation condition should be evaluated in its context and only reasonable specificity is required].) The purpose of condition 12.f. is to protect the public from violence or threats of violence and to prevent future criminality. To effectuate this purpose, Forrest is on fair notice she is prohibited from using or possessing actual firearms or weapons and she is also prohibited from confronting others with devices those individuals could reasonably perceive to be a weapon or firearm. The term "replica firearm or weapon" adequately conveys this prohibition. (See § 417.4 [preventing drawing or exhibiting an imitation firearm in a manner that causes a reasonable person apprehension or fear of bodily harm]; see also § 16700 [defining an imitation firearm to include a replica of a firearm that is "so substantially similar in coloration and overall appearance . . . as to lead a reasonable person to perceive that the device is a firearm"].) No reasonable person would construe condition 12.f. as applying to a small-scale object that did not look like a real weapon.

   b. "[*A*]*ny instrument used as a weapon*"

Forrest next contends the use of the word "used" in the phrase "any instrument used as a weapon" renders condition 12.f. unconstitutionally vague because it is unclear whether the phrase prohibits (1) the possession of any instrument where she intends to use the instrument as a weapon, or (2) the possession of any instrument which is

31

sometimes capable of being used as a weapon. She requests that condition 12.f. be modified to state "any instrument used by the probationer as a weapon." (Italics omitted.)

We conclude there is no need to modify condition 12.f. because, again, this condition is clearly directed at prohibiting weapon possession and, when it is read in context, reasonable persons would understand that "any instrument used as a weapon" refers to an item that is being used, or is intended to be used, as a weapon, and does not refer to any object that might conceivably be used as a weapon. The phrase "used as a weapon" on its face excludes objects that are merely capable of being used as a weapon but are not actually being used as such. Also, because a violation of condition 12.f. requires Forrest to have had knowledge that the object instrument is used as a weapon, she will not be subjected to a probation violation unless she knows the instrument she possesses is intended for use as a weapon. For example, a probationer convicted of a violent crime would not be in violation of condition 12.f. by carrying a bat to baseball practice, but would be in violation of that condition if she or he possessed a baseball bat in the context being a member of a gang on the way to a gang-related confrontation.

c. *Possession for self-defense*

Forrest also contends condition 12.f. is unconstitutionally overbroad "to the extent that it does not contain an exception for the temporary possession of a weapon in lawful self-defense." She asserts that "should [s]he find [herself] in a real emergency where [her] life is under immediate threat, [she] should not be prohibited from defending [herself] from that threat even where doing so requires the use of a weapon or an improvised weapon." Forrest maintains that condition 12.f. should be modified by

32

appending to the end of this probation condition the phrase "except when such possession is justified because the firearm or weapon is used in accordance with the law of self-defense."

We reject Forrest's claim that condition 12.f. is unconstitutionally overbroad. When a probationer has been convicted of a violent crime, imposition of a strict condition of probation prohibiting ownership or possession of weapons is essential to promote public safety. Here, given the importance of clearly communicating to Forrest that she is prohibited from owning or possessing weapons, it is reasonable to exclude from condition 12.f. a reference to self-defense to ensure she does not believe she is permitted to knowingly own or possess a weapon in some circumstances in anticipation of the possible need for self-defense. We are satisfied that no reasonable law enforcement official or court will interpret the prohibition of weapon possession to extend to a fleeting possession of a weapon in the event, for example, that Forrest is assaulted and she temporarily seizes an object to use as a weapon in self-defense. The omission of a reference to self-defense does not render condition 12.f. constitutionally overbroad.

2. *Condition 6.d.*: *restriction on possessing weapons*

Condition 6.d., which is also set forth in the October 28 probation order, provides: "THE DEFENDANT SHALL: [¶] . . . [¶] Not knowingly possess a firearm, ammunition, or deadly weapon."

Forrest claims condition 6.d. is unconstitutional and must be stricken or modified because "[t]his condition's lack of an exception for the temporary possession of a weapon in lawful self-defense renders it unconstitutionally overbroad." The Attorney General

33

argues that Forrest's proposed modification of condition 6.d. is "antithetical to the rehabilitative purposes and public safety concerns under [that condition]." We agree. We reject Forrest's facial challenge to condition 6.d. for the reasons we explained, *ante*, in rejecting her contention that condition 12.f. of her probation is unconstitutionally overbroad to the extent it does not contain an exception for the temporary possession of a weapon in lawful self-defense. The omission of a reference to self-defense does not render condition 6.d constitutionally overbroad.

3. *Condition 12.g.*:  *restriction on being in the presence of weapons*

Condition 12.g., as set forth in the probation order, states: "Do not remain in any building, vehicle or in the presence of any person where you know a firearm, deadly weapon, or ammunition exists."

Forrest contends this condition is unconstitutionally overbroad and should be stricken or modified because (she asserts) it prohibits her "from entering state and federal courthouses, police stations, military installations, federal and state office buildings and any other building with armed security personnel since each of these buildings contain armed individuals." She further contends this condition improperly impinges on her constitutional rights of association and to access the courts.

We agree condition 12.g must be modified in order to address Forrest's well-founded concerns. Given the widespread presence of armed security personnel in buildings and other locales, we conclude condition 12.g. is unconstitutionally overbroad because it unduly restricts Forrest's constitutionally guaranteed freedom of travel and association and her right to access the courts, and because it is not narrowly tailored to

34

safeguard these fundamental rights while restricting her conduct in a manner reasonably designed to promote her rehabilitation and to protect public safety.

In her appellant's opening brief, Forrest argued that condition 12.g should be modified to restrict her presence at locations where weapons are *illegally* present. Specifically, she proposed that condition 12.g be modified to read as follows:

> "Do not remain in the presence of those you know illegally possess firearms, deadly weapons or ammunition."

The Attorney General responded by objecting to Forrest's proposed modification, asserting it "would allow [her] to remain in the presence of anyone who *legally* possesses deadly weapons" and, thus, it "would wholly undermine the purposes underlying the probation condition" by "allow[ing] [her], for example, to knowingly visit a stash house stocked with .22-caliber rifles or to live in a house of armed bank robbers, so long as [she] does not know that the weapons are illegal or otherwise *unlawfully* possessed." The Attorney General proposed that, in order to remedy the unconstitutional overbreadth while continuing to keep Forrest from knowingly having ready access to prohibited weapons, condition 12.g should be modified to read as follows:

> "Do not remain in the presence of any person whom you know illegally possesses a firearm, deadly weapon, or ammunition. Also, do not remain in a building, vehicle or in the presence of any person when you knowingly have ready access to a firearm, deadly weapon, or ammunition, regardless of whether it was lawfully possessed or acquired."

In her reply brief Forrest does not object to the first sentence of the foregoing modification proposed by the Attorney General, which states: "Do not remain in the

35

presence of any person whom you know illegally possesses a firearm, deadly weapon, or ammunition."   She asserts this first sentence "essentially mirrors [her] suggestion."

With respect to the second sentence of the modification proposed by the Attorney General—which (as noted) states, "Also, do not remain in a building, vehicle or in the presence of any person when you knowingly have ready access to a firearm, deadly weapon, or ammunition, regardless of whether it was lawfully possessed or acquired"—Forrest asserts she "would be happy with this second sentence if it was limited to firearms."  She argues this sentence should be limited to firearms because "[a] probationer will have ready access to 'deadly weapons' and 'ammunition' any time she enters either a sporting goods store or a general store such as Walmart as these items are generally placed on store shelves and may be seen as readily accessible."  Forrest proposes the following "hybrid" modification of condition 12.g:

> "Do not remain in the presence of any person whom you know illegally possesses a firearm, deadly weapon, or ammunition.  Also, do not remain in a building, vehicle or in the presence of any person when you knowingly have ready access to a *firearm* regardless of whether it was lawfully possessed or acquired."  (Italics added.)

Forrest argues that, under her proposed modification of condition 12.g, "[she] would not be unreasonably restricted in her movements and the state's interest in preventing [her] presence in weapon store houses or [her] living with 'armed bank robbers' would be maintained."

We agree.  Such a modification will remedy the unconstitutional overbreadth of probation condition 12.g while safeguarding the state's interests in maintaining public safety, preventing future criminality, and rehabilitating Forrest by deterring her from

36

knowingly having ready access to firearms. Accordingly, we shall order that condition 12.g be modified to read as follows:

> "Do not remain in the presence of any person who you know illegally possesses a firearm, deadly weapon, or ammunition. Also, do not remain in a building, in a vehicle, or in the presence of any person when you knowingly have ready access to a firearm, regardless of whether it is lawfully possessed or was lawfully acquired."

## V.  *CORRECTION OF THE OCTOBER 28 MINUTE ORDER AND PROBATION ORDER*

Last, Forrest contends that both the October 28 minute order and the October 28 probation order must be corrected because they do not reflect the court's oral pronouncement of sentence that she serve 365 days in local custody as a condition of her probation. The Attorney General acknowledges the minute order and probation order should be corrected to conform to the oral pronouncement of judgment.

We agree with the parties. The October 28 reporter's transcript shows the court stated that Forrest was "committed to the custody of the Sheriff [for] 365 days." The record also shows that, although both the minute order and probation order originally reflected—correctly—that Forrest was committed to the custody of the sheriff for "365" days, that number was erroneously crossed out and the number "372" was written in its place.

We conclude the matter should be remanded to the superior court with directions to correct both the October 28 minute order and the October 28 probation order to reflect the court's oral pronouncement of sentence that she serve 365 days in local custody as a condition of her probation.

37

DISPOSITION

Probation condition 12.g is modified to read: "Do not remain in the presence of any person who you know illegally possesses a firearm, deadly weapon, or ammunition. Also, do not remain in a building, in a vehicle, or in the presence of any person when you knowingly have ready access to a firearm, regardless of whether it is lawfully possessed or was lawfully acquired." As so modified, the judgment is affirmed.

The matter is remanded to the superior court with directions to (1) correct probation condition 12.g., which is set forth in the October 28, 2013 order granting formal probation, and forward a copy of the corrected condition to the probation authorities; and (2) correct both the October 28, 2013 minute order and the October 28, 2013 probation order to reflect the court's oral pronouncement of sentence that she serve 365 days in local custody as a condition of her probation and forward a copy of the corrected probation order to the probation authorities.


NARES, J.

WE CONCUR:


McCONNELL, P. J.

HALLER, J.


38